SERCOMBE, S.J.
*695 This case concerns whether the Land Conservation and Development Commission (LCDC) erred in determining that there was not "good cause to proceed" to an enforcement hearing that petitioner had demanded against Lane County. See ORS 197.324(2)(b) (before proceeding to a hearing on a privately initiated enforcement petition, LCDC must "determine if there is good cause to proceed on the petition"). Petitioner asked LCDC to conduct that enforcement hearing and order the county to adhere to particular procedural requirements in Lane Code (LC) 14.050. After a preliminary hearing, LCDC entered an order in which it determined that petitioner failed to prove that the county had engaged in a pattern of noncompliance with LC 14.050, and, accordingly, that there was not good cause to proceed to an enforcement order hearing. On appeal, petitioner argues that the number of proven violations of LC 14.050 shows a substantial pattern of noncompliance and "good cause to proceed" as a matter of law. We conclude that LCDC's order was not unlawful in substance and that it was supported by substantial evidence in the whole record. ORS 197.335 (2)(a), (d) (standard of review for final enforcement orders). Accordingly, we affirm.
We first set out the legal context of the LCDC order. LCDC is authorized to adopt statewide land use policies that govern the content of local land use comprehensive plans. ORS 197.040. It is also authorized to approve comprehensive plans as consistent with those policies, and undertake enforcement actions against local governments for failure to comply with the statewide policies, the plans, or regulations that implement a plan. ORS 197.320. ORS 197.320 empowers the commission to order a local government to bring its land use policies and decisions into compliance with the statewide planning goals, the provisions of a comprehensive plan, or local land use regulations. One of the bases for a compliance order is when "[a] local government has engaged in a pattern or practice of decision making that violates an acknowledged comprehensive plan or land use regulation." ORS 197.320(6). As we explained in Schoonover v. LCDC , 104 Or. App. 155, 158-59, 799 P.2d 679 (1990), " ORS 197.320 applies when there is a generalized failure by a planning *696 jurisdiction to comply with various requirements of the land use laws, over and above any errors in a particular land use decision."
Enforcement proceedings may be initiated by LCDC or by a private party. ORS 197.324. ORS 197.319 to ORS 197.335 prescribe the procedures by which a citizen may seek LCDC enforcement of local land use planning requirements. Pursuant to ORS 197.319(1), a citizen must present the reasons for an enforcement order to the affected local government and request modifications to particular land use policies or an action by the local government to effect existing policy. If the local government "does not act in a manner which the requestor believes is adequate to address the issues raised in the request *** a petition may be presented to [LCDC] under ORS 197.324." ORS 197.319(2)(c).
Under ORS 197.324(2), when that petition is presented,
"(b) The commission shall determine if there is good cause to proceed on the petition.
"(c) If the commission determines that there is not good cause to proceed on the petition, the commission shall issue a final order dismissing the petition, stating the reasons therefor.
*1066 "(d) If the commission determines that there is good cause to proceed on the petition, the commission shall proceed as set forth in ORS 107.328 [describing the hearing procedures for an enforcement proceeding]."
OAR 660-045-0040 -one of a series of rules adopted by the commission to implement ORS 197.319 to 197.335 -sets out the content of an enforcement demand presented to a local government under ORS 197.319. When a requestor seeks enforcement based on allegations of a pattern of non-compliant decisions, the requestor must describe (1) "the mode, method, or instance of decision making that constitutes the pattern," (2) "an estimate of the total number of decisions making up the pattern," and (3) "[t]he period within which the decisions constituting the pattern were made." OAR 660-045-0040(4). After the local government response, see OAR 660-045-0050, if the requestor wishes to *697 commence compliance proceedings with the commission, it must file a petition with LCDC that contains,
"(a) A request for the commission to adopt an enforcement order to secure the corrective action sought in the citizen's initial request to the affected local government or district;
"(b) An explanation of why the affected local government or district's response to the request is not adequate, or a statement that the affected local government or district failed to respond; and
"(c) A statement of the consequences likely to result from the affected local government or district's refusal to take adequate corrective action."
OAR 660-045-0060(1).
The petition is then reviewed by the Department of Land Conservation and Development which recommends a course of action to the commission. OAR 660-045-0090 provides, in part:
"(1) The commission shall conduct a public hearing to determine whether there is good cause to proceed to a contested-case hearing.
"* * * * *
"(6) The commission shall find that there is good cause to proceed to a contested-case hearing if the information described in Section 5 contains substantial evidence of noncompliance.
"(7) If the commission finds there is not good cause to proceed, it shall issue an order dismissing the petition and stating its reasons for doing so."
(Emphasis added.)
"Noncompliance" is defined as a status or "problem" that includes a "pattern of decision making." Under OAR 660-045-0020(9), noncompliance
"means a state of not being in compliance with a currently applicable comprehensive plan, land use regulation, *** or other regulation or agreement ***. The term includes a failure to comply with applicable case law in making a land use decision. The term includes a pattern or practice of *698 decision making that violates an acknowledged comprehensive plan or land use regulation. Noncompliance is the problem that an enforcement order seeks to eliminate through corrective action."
(Emphases added.) OAR 660-045-0020(10) defines noncompliance that is a "pattern of decision making" as
"a mode, method, or instance of decision making representative of a group of decisions with these characteristics:
"(a) The decisions involve the same or related provisions of an acknowledged comprehensive plan, land use regulation, or special district cooperative agreement;
"(b) The decisions involve the same or similar geographic areas, plan designations, zones, or types of land use; and
"(c) The decisions occurred within the three years preceding the date on which the requestor sent the affected local government the request described in OAR 660-045-0040, or the decisions are likely to occur after that date."
Here, petitioner asserted that the county violated LC 14.050 in processing a number of land use applications between July 2, 2009, and July 2, 2012 (the date on which the county received petitioner's demand). LC 14.050 sets out time deadlines within which to complete an application for a land use decision and to determine the merits of that application. Specifically, LC 14.050(3)(b)(i) provides that an application must be reviewed *1067 by the planning director for completeness, and if the application is incomplete, the director "shall notify the applicant in writing of exactly what information is missing within 30 days of receipt of the application and allow the applicant to submit the missing information." Under LC 14.050(3)(c), "On the 181st day after first being submitted, the application is void if the applicant has been notified of the missing information as required under LCC 14.050(3)(b)(i) and has not submitted" the required information or notified the county that some or all of the information will not be submitted. According to documentation that petitioner submitted, one incomplete land use application was not voided during the relevant three-year period. *699 Petitioner also complained that the county violated LC 14.050(5) in processing 34 land use decisions within the relevant three-year period. LC 14.050(5) provides, in part:
"(5) Timelines for Final Action. *** For development sites located outside an urban growth boundary, except as provided in LC 14.050(5)(a) through (d) below, the Approval Authority shall take final action on an application for a permit, limited land use decision or zone change within 150 days after the application is deemed complete. *** Exceptions to the requirement to take final action on an application within *** 150 days are:
"(a) When an applicant waives or requests an extension of the required ***150-day period for final action. The period set in LC 14.050(5) above may be extended for a specified period of time at the written request of the applicant. The total of all extensions may not exceed 215 days."
According to petitioner, the county failed to obtain the necessary extensions of time, granted unlimited extensions of time, or otherwise failed to reach a decision within 150 days of completed applications for the cited 34 decisions.[1]
Petitioner sought corrective actions from the commission: an order directing the county governing body to "interpret" LC 14.050(3)(c) and 14.050(5) by restating the deadlines provided in the code provision and to adopt amendments to LC 14.050 to distinguish between a "waiver" and an "extension" of the decisional deadlines. In response to petitioner's claims, the county asserted that the untimely actions were not a "pattern of decision making" under OAR 660-045-0020(10) and that the county had taken actions to address the deadline issues by revising its clerical procedures and amending its form for requesting a waiver of the deadline or an extension of time. The amended form required specificity as to the duration of any time extension and warned that the total extensions could not exceed 215 days. The county also revised its "incomplete letter" to *700 applicants to warn applicants that incomplete applications become void after 180 days. The county refused to take any further action.[2]
LCDC concluded that on the facts presented-a showing of 34 violations of the LC 14.050 decisional deadlines and one violation of the application completeness deadline out of a total of 757 decisions by the county that also applied LC 14.050 during the relevant time-petitioner failed to prove a "pattern of decision making" that constituted "good cause to proceed" to a hearing on violations and remedies.[3] Applying OAR 660-045-0020(10), the commission first determined that the 34 violations did "involve the same *1068 *** land use regulation" (LC 14.050) that was applied during the relevant three-year period in the "same geographic area" (the entire county). However, the commission reasoned that "good cause to proceed" on the county's failure to take action within 150 days of a completed application had not been shown. First, according to LCDC, the participatory rights of citizens had not been risked by the 34 violations of the decisional time deadline and that the bulk of those violations were bookkeeping errors:
"Thus, it is not the fact that some decisions are made by the county after the 150-day deadline or that the county has insufficient or missing documentation extending the 150-day deadline (a matter which all parties agree is held exclusively by the applicant) that causes harm to participants, but rather the late decisions create an opportunity for harm (by virtue of the fact that an applicant can elect to file a petition for a writ of mandamus). However, as LandWatch acknowledges, participants are not actually *701 "cut out" of the mandamus process, as they are entitled to intervene. The significant difference is that during a mandamus proceeding the burden is shifted from the applicant to the county and any intervenors to demonstrate that an approval would violate a substantive provision of the comprehensive plan or land use regulations.
"For almost all of the alleged violations, the Department found and the Commission agrees that Lane County could have cured the problem if it had obtained the proper extensions (i.e., only one or two of the cases appear to have taken more than the maximum permitted extended timeline of 365 days)."[4]
(Emphasis in original.)
LCDC further explained that the small number of overall violations was a relevant factor in determining whether a "pattern of decision making" and "good cause to proceed" existed. According to LCDC, that small number weighed against determining that there was good cause to proceed:
"Although, there is not a numeric threshold established which must be exceeded, the Commission finds that the relatively small number of alleged violations (including only one writ of mandamus) when compared to the overall workload of the county is inadequate to show substantial evidence of noncompliance. The small percentage of applications that run afoul of the procedural requirements is a factor that the Commission considers in determining whether a reasonable person would conclude that there are good grounds to proceed to a contested case hearing on this request."
LCDC also determined that petitioner had not shown that the decisional deadline violations were not intentionally extended or avoided by the county in order to affect the outcome of a "class of decisions" and that the cited "instances" were not representative of a particular type or location of land use decisions under OAR 660-045-0020(10) :
*702 "[There] may be justification for Commission enforcement if there was evidence that Lane County deliberately avoided making decisions in order to affect the outcome of a class of decisions based on a particular plan or code provision or designation, geographic area, or type of use, or if the county was unresponsive to concerns raised. With respect to the former, no such allegation is raised in LandWatch's petition, and Lane County's response demonstrates that the nature of the cases are unrelated both with respect to location and application type. In addition, as earlier discussed, the county has identified measures that it has already undertaken since the beginning of 2012 to resolve its timeliness issues and documentation of extensions of deadlines.[5]
*1069 LCDC similarly found that the alleged practice of granting extensions that are not for a specified period of time or that exceed a total of 215 days did not constitute "good cause to proceed" to a compliance order. LCDC further explained:
"LandWatch asserts a 'practice' of granting extensions that are not for a specified period of time or that exceed a total of 215 days. *** The Commission however, notes that the Department nevertheless considered the extension issue and determined that Lane County could have cured the identified problem by obtaining the proper extension; that Lane County has taken measures to resolve the documentation of extension with a new form that requires a specified number of days and notes that 'final action timeline extended by an applicant may not exceed 215 days,' citing ORS 215.427(5) ; and, that 34 alleged violations out of 757 decisions result in a small percentage of violations. *** In light of those considerations, even if LandWatch had alleged a 'pattern of decision making' regarding extensions under LC 14.050(5), the Commission would find that LandWatch has not established that there is substantial evidence that Lane County has engaged in a mode, method, or instance of decision making representative of a group of decisions likely to occur after the request."
(Footnote omitted.)
*703 Finally, LCDC concluded that proof "at most" of a single violation of LC 14.050 by the failure to void an incomplete land use application after 180 days was insufficient to establish a "mode, method, or instance of decision making representative of a group of decisions" with common characteristics under OAR 660-045-0020(10).[6]
On review, petitioner contends that LCDC incorrectly determined that there was not "good cause to proceed" on its claims of noncompliance with LC 14.050. As noted, the question on review is whether petitioner presented substantial evidence of a "pattern of decision making" sufficient to obligate the commission to determine that there was "good cause to proceed" to an enforcement hearing. Petitioner claims that it proved a "pattern of decision making" by evidence of 34 violations of the LC 14.050 decisional deadlines. Petitioner reasons that each of the 34 decisions is a "mode, method, or instance of decision making" that is representative of the group of those same 34 decisions, and that that group of 34 decisions has the necessary commonality required by OAR 660-045-0020(10) (application of LC 14.050 in the same county-wide geographic area over a three-year period of time). Petitioner further argues that LCDC determined otherwise based on immaterial considerations-the good faith of the county, lack of harm to citizens by any procedural violation, the use of mandamus to remedy only one violation, and the small size of the group of decisions.
LCDC counters that, under OAR 660-045-0020(9), "noncompliance" means a "state of not being in compliance with a currently applicable *** land use regulation" that can include a "pattern of *** decision making that violates an *704 acknowledged land use regulation." According to LCDC, the purpose of enforcement proceedings is to ensure future compliance. See ORS 197.335(1)(c) (describing measures that the commission might order upon proof of a noncomplying pattern of decision making). LCDC argues that a state of not being in compliance does not exist when the violations are infrequent, minor, and technical in nature and the local government has adopted measures to reduce the frequency of the violations further and the need for further corrective actions. Petitioner replies that the purpose of an enforcement order and the extent and nature of the *1070 violations are immaterial to whether there is good cause to proceed to an enforcement hearing.
We evaluate those contentions with a deferential standard of review. A reviewing court generally defers to an agency's construction of its own rules if that interpretation is plausible and consistent with the rule's text and context. Don't Waste Oregon Com. v. Energy Facility Siting , 320 Or. 132, 142, 881 P.2d 119 (1994). When an agency interprets statutory terms, whether by rulemaking or in the course of adjudication, we defer to the agency's interpretation of those terms if they are "delegative" in nature. Springfield Education Assn. v. School Dist. , 290 Or. 217, 222-28, 621 P.2d 547 (1980). Delegative terms are those that express non-completed legislation that the agency is given delegated authority to complete. Id. at 228, 621 P.2d 547.
Here, the legislature allowed LCDC to issue a compliance order "if the commission has good cause to believe *** [a] local government has engaged in a pattern *** of decision making that violates *** [a] land use regulation," ORS 197.320(6), and required the commission to determine the "nature of the noncompliance," ORS 197.335(1)(a). The legislature also required LCDC to "adopt rules that it considers necessary to carry out ORS chapters 195, 196, and 197." ORS 197.040(1)(b). We conclude that we apply a deferential standard of review to LCDC's plausible construction of the delegative terms "pattern of decision making" and "noncompliance" in ORS 197.320(6) and ORS 197.335(1)(a).
We construe the commission's interpretation of "pattern of decision making" to require proof that a particular *705 mode, method, or instance of decision making is "representative" of a larger group of contemporaneous decisions with common characteristics to the cited instance or instances of decision making. In this case, LCDC reasoned that the cited 34 violations of the LC 14.050 decisional deadlines were sui generis and not representative of a class of decisions that applied LC 14.050 to land use permit applications in that same geographic area. LCDC noted that there might be "justification for Commission enforcement" if the cited violations were representative of a larger group of avoided decisions "based on a particular plan or code provision or designation, geographic area, or type of use."
To determine whether the commission's construction of OAR 660-045-0020(9) and (10) is unlawful in substance, we determine the intended meaning of the rule using the principles of statutory construction outlined in PGE v. Bureau of Labor and Industries , 317 Or. 606, 611-12, 859 P.2d 1143 (1993) and State v. Gaines , 346 Or. 160, 206 P.3d 1042 (2009). See Haskins v. Palmateer , 186 Or. App. 159, 166, 63 P.3d 31, rev. den. , 335 Or. 510, 73 P.3d 291 (2003) ("In interpreting administrative rules, we apply the same principles of interpretation that are used to construe statutes."). "At the first level of analysis, we examine the text and context of the rule to discern the intent of the agency." State v. Hogevoll , 348 Or. 104, 109, 228 P.3d 569 (2010). Terms of common usage in the text of a rule "should be given their plain, natural, and ordinary meaning unless specifically defined or used in some other way." Id . at 110, 228 P.3d 569.
Here, the meaning of "pattern of decision making" under OAR 660-045-0020(10) is plain. A noncomplying "state" or "problem" under OAR 660-045-0020(9) can be shown by a "pattern of decision making" that, in turn, requires proof of: (1) a "mode, method, or instance of decision making;" (2) is "representative;" (3) of a larger group of decisions that share common characteristics (the same or related land use policies, the same or related geographic area or land use categorization, and the same time period) with the decisions used to establish the "mode, method, or instance of decision making." In ordinary parlance, "representative" means "1 : serving to represent, portray, or typify : characterized by representation *** 4 : serving as a characteristic example *706 : illustrative of a class : conveying an idea of others of the kind : TYPICAL (a [similarity symbol] modern play) (a [similarity symbol] romantic poem)." Webster's Third New Int'l Dictionary 1926 (unabridged ed. 2002) (capitalization and boldface in original). Similarly, a "pattern" is "4 a : a representative instance : a typical example b : a specimen offered as a sample of the whole." Id . at 1657 (boldface in *1071 original). Thus, a petitioner can show substantial evidence of noncompliance by proving that an improper method or instance of making a particular type of land use decision is representative or typical of the method of making contemporary land use decisions of the same type or class. That extrapolation proves a pattern of decision making and a state of noncompliance.
As LCDC explained, in this case, petitioner failed to make that required showing. Instead, it was clear that the 34 land use decisions were not representative of a class of the same type of decisions (land use decisions subject to the time constraints of LC 14.050 that were made within the county during the relevant timeframe). That class of 757 decisions-except for the 34 instances of noncompliance-complied with LC 14.050. The 34 noncomplying decisions were atypical of that class of complying land use decisions.
LCDC recognized this missing correlation when it opined that there could be grounds for enforcement "if there was evidence that Lane County deliberately avoided making decisions in order to affect the outcome of a class of decisions based on a particular plan or code provision or designation, geographic area, or type of use, or if the county was unresponsive to the concerns raised." In other words, a pleaded mode or instance of decision making involving the application of LC 14.050 must be typical of a class of decisions applying that same code provision. Here, as LCDC explained, the decisions at issue were not.
We conclude that LCDC's construction of its rules and the statutory delegative terms within those rules was plausible and is subject to deference on review. LCDC plausibly concluded that petitioner failed to show a "pattern of decision making." Petitioner did not prove a "generalized failure by [the county] to comply with various requirements *707 of the land use laws, over and above any errors in a particular land use decision." Schoonover, 104 Or. App. at 158-59, 799 P.2d 679. Accordingly, LCDC did not err.
Affirmed.

Pursuant to ORS 215.429(5), when a local government fails to take final action on a land use decision within the required time, an applicant may obtain a peremptory writ of mandamus to approve the application "unless the governing body or any intervenor shows that the approval would violate a substantive provision of the county comprehensive plan or land use regulations." In one of the 34 decisions at issue the applicant petitioned for and obtained a writ of mandamus.

The county had revised LC 14.050 to be consistent with ORS 215.427(1) in 2009. Pursuant to ORS 197.625(1), that amendment was acknowledged by the commission as consistent with the statewide planning goals and ORS 215.427(1).

Petitioner alleged that the county noncomplying actions constituted not only a "pattern of decision making" but also a "practice of decision making" under OAR 660-045-0020(11). That rule defines a "practice of decision making" as a "series or succession of decisions" that occurred within the same geographic area during the relevant time period and involved the same land use policies. LCDC concluded that a "pattern of decision making" included the process used in making the decisions, but that a "practice of decision making" is confined to the "substantive final decisions." Since petitioner did not allege that the substantive final decisions were incorrect, LCDC determined that a "practice of decision making" was not present. Petitioner does not challenge that determination on review.

LCDC explained that specific prejudice to a petitioner was not required to make a "good cause to proceed" determination, stating that "a 'substantial prejudice' standard does not apply." Cf. ORS 197.850(9)(a) (Land Use Board of Appeals final order reviewed to determine whether "order [that is] unlawful in *** procedure" where the "court finds that substantial rights of the petitioner were prejudiced thereby").

LCDC further found that "Lane County has implemented reforms to its quasi-judicial application review procedures in order to avoid further procedural errors."

In its third assignment of error, petitioner contends that this particular finding lacks substantial evidence because there was evidence that the county failed to void more than one incomplete land use application. That evidence was scant and not included as part of petitioner's burden of going forward with "[a]n estimate of the total number of decisions making the pattern" under OAR 660-045-0040(4). We conclude that the commission "understood and applied the substantial evidence standard correctly" in making this finding, Barkers Five, LLC v. LCDC , 261 Or. App. 259, 348, 323 P.3d 368 (2014), and do not address it further. Petitioner's remaining contentions on the substantiality of the evidence to support LCDC's ultimate legal conclusions go to the commission's legal reasoning and are assessed below under the "unlawful in substance" review standard. ORS 197.335(2)(a).